16-3379
United States v. Mirilashvili

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of June, two thousand eighteen.

PRESENT:  DENNIS JACOBS,
              CHRISTOPHER F. DRONEY,
                  Circuit Judges,
              MICHAEL P. SHEA,[1]
                  District Judge.

- - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,
        Appellee,

        -v.-                                16-3379

DAMON LEONARD, JOMARIS JAVIER, RAY WILLIAMS, also known as Obama, DORIAN

---

[1] Judge Michael P. Shea, of the United States District Court for the District of Connecticut, sitting by designation.

**AVERY, TASHEEN DAVIS, also known as Hollywood, GANEENE GOODE, also known as Big Gina, THOMAS WHITE, also known as Black, CAROLYN MIDDLETON, JOSEPH GRAY, also known as Dogs, KEVIN FRYE, also known as Pretty Kev,**
        <u>**Defendants**</u>,

**MOSHE MIRILASHVILI,**
        <u>**Defendant-Appellant**</u>.[2]
- - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| **FOR APPELLANT:** | NATHANIEL Z. MARMUR, The Law Offices of Nathaniel Z. Marmur, PLLC; New York, NY. |
| **FOR APPELLEE:** | EDWARD B. DISKANT, Assistant United States Attorney (Brooke E. Cucinella, Anna M. Skotko, Assistant United States Attorneys, <u>on the brief</u>), <u>for</u> Geoffrey S. Berman, United States Attorney for the Southern District of New York; New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (McMahon, <u>Ch.J.</u>).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court is **AFFIRMED**.

Moshe Mirilashvili appeals from a judgment entered September 29, 2016 in the United States District Court for the Southern District of New York (McMahon, <u>Ch.J.</u>), convicting him after a jury trial on one count of conspiracy to

---

[2] The Clerk is respectfully directed to amend the caption as above to reflect the correct spelling of Defendant-Appellant's last name.

2

distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), and two counts of distributing oxycodone, each in violation of 21 U.S.C. § 841. He was sentenced principally to 160 months' imprisonment, to be followed by three years of supervised release. Forfeiture was ordered in the amount of $2,046,600. We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

Mirilashvili was a pain management doctor in Washington Heights in 2012. At trial, the government's theory was that Mirilashvili was not engaged in the legitimate practice of medicine, and that he played a critical role in an oxycodone distribution scheme by agreeing to write prescriptions in exchange for cash.

The jury convicted Mirilashvili on all three counts. On appeal, Mirilashvili argues that the district court erred by (1) limiting the testimony of Mirilashvili's expert witness; (2) instructing the jury on conscious avoidance; and (3) improperly calculating the forfeiture amount.

**1.** Dr. Carol Warfield, a pain management expert, testified for the defense. Mirilashvili sought to elicit testimony drawing a distinction between the civil malpractice standard and the criminal standard, in aid of the argument that Mirilashvili's conduct might have been negligent, but was not criminal. The district court prohibited Dr. Warfield from opining about the standard of care in pain management and terms relating to civil liability, explaining that "best practices" and the "standard of care" were irrelevant, and that she "[did] not intend to confuse the jurors by interjecting new terms into the case." Special App'x 2. Mirilashvili argues that this limitation impaired Dr. Warfield's credibility by forcing her either to endorse or reject Mirilashvili's conduct, instead of conceding that Mirilashvili's medical practices may have merely constituted malpractice.

"[T]he decision of whether to admit expert testimony is left to the discretion of the trial judge and should not be set aside unless manifestly erroneous." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (internal quotation marks omitted). An expert may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in

applying that law to the facts before it." Id. (internal quotation marks omitted). "[A] judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [under the Federal Rules of Evidence]," including Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Daubert v. Merrell Dow. Pharm., Inc., 509 U.S. 579, 595 (1993) (internal quotation marks and alteration omitted). We also review evidentiary rulings for harmless error. See United States v. Onumonu, 967 F.2d 782, 788 (2d Cir. 1992).

To convict a prescribing physician under 21 U.S.C. § 841(a), the government must prove that the physician "caused the drugs to be dispensed other than for a legitimate medical purpose, other than in good faith, and not in the usual course of medical practice." United States v. Wexler, 522 F.3d 194, 206 (2d Cir. 2008). At issue in Wexler was the trial ruling that the government's expert could opine that the prescription of certain medications, including pain killers, was outside "the standard of care provided by dermatologists." Id. at 203. In rejecting the defendant's challenge to the ruling, we explained that "[w]hile failure to comply with the standard of care applicable to a medical specialty does not alone provide a basis for concluding that a physician's activities fall outside the usual course of professional practice, it surely is relevant to that determination." Id. at 204. "[O]nly after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the usual course of professional practice that his actions become criminal." Id. (internal quotation marks omitted).

Clearly, under Wexler, the district court could have permitted Dr. Warfield to testify as to the standard of care in pain management. However, we need not decide whether foreclosure of such testimony was manifestly erroneous, because (a) the jury heard testimony and argument that drew the distinction between medicine and crime, (b) the jury charge drew the same distinction, and (c) the evidence showed that the defendant was not engaged in a legitimate medical practice. Accordingly, we conclude that any error was harmless.

4

(a) Notwithstanding the evidentiary ruling, Dr. Warfield was permitted to testify that Mirilashvili engaged in "good" practices with respect to entering into patient agreements, offering physical therapy, and responding to patient requests for opioids. See, e.g., Tr. 1221, 1224. She agreed that there is a "big range of types of practices that a doctor may have in the usual course of medical practice[,]" including "from the best possible down to he could be doing better." Tr. 1277. And Mirilashvili remained free to argue on summation (and did argue) that he may have been a bad doctor, but that he was not a criminal: "We are sitting in this courtroom today in a criminal case, not in a medical malpractice case. . . . [Y]ou cannot convict a doctor if you believe that all the evidence showed was that he just wasn't a very good doctor. You cannot convict this man even if you believe he was a bad doctor. As the Court I expect will instruct you, you can only convict Dr. Mirilashvili if his practice amounted to not being a doctor at all." Tr. 1332

(b) The district court instructed that the jury could not convict Mirilashvili on the basis of negligence:

> You must remember this is not a medical malpractice case. It is not enough for the government to prove any degree of negligence, malpractice, carelessness or sloppiness on Dr. Miril[a]shvili's part. You cannot convict the defendant if all the government proves is that he is an inferior doctor, or that he was running a medical office that was not a "center of excellence. . . ."

Tr. 1460. The jury instructions thus foreclosed conviction for merely being a bad doctor, and we presume that juries follow the instructions they are given. United States v. Stewart, 433 F.3d 273, 310 (2d Cir. 2006).

(c) Assuming arguendo that the district court erred in prohibiting Dr. Warfield from testifying as to the standard of care for pain management, we conclude that the error was harmless because "the judgment was not substantially swayed by the error." See Kotteakos v. United States, 328 U.S. 750, 765 (1946).

The evidence of Mirilashvili's guilt was substantial: two cooperating witnesses testified, each of whom participated in the drug trafficking scheme; lay

witnesses described a large influx of people outside the Washington Heights clinic, with cars double-parked or triple-parked outside; evidence that immediately after Mirilashvili received a grand jury subpoena for the medical records of a patient suspected of illegally filling an oxycodone prescription, he created records for that patient, and backdated them; and the government adduced fraudulent and altered medical records, bundles of cash totaling over $1.75 million found in Mirilashvili's home, and records showing a dramatic increase in Mirilashvili's tendency to prescribe the same dosage of 90 30-milligram oxycodone tablets over the course of the conspiracy. Accordingly, Mirilashvili's conviction did not depend on the testimony of either side's expert witness.

**2.** Mirilashvili argues that the conscious avoidance charge was inconsistent with the government's theory: that Mirilashvili was running a drug conspiracy in league with the crew chiefs.

We review "a claim of error in jury instructions <u>de novo</u>, reversing only where, viewing the charge as a whole, there was prejudicial error." <u>United States v. Aina-Marshall</u>, 336 F.3d 167, 170 (2d Cir. 2003). A conscious avoidance charge may be given if (1) the defendant has asserted "the lack of some specific aspect of knowledge required for conviction," and (2) there is an "appropriate factual predicate for the charge, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." <u>United States v. Fofanah</u>, 765 F.3d 141, 144-45 (2d Cir. 2014) (per curiam) (internal quotation marks and ellipsis omitted). "When a defendant has been charged with conspiracy . . . the jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy but . . . may *not* use it to establish the defendant's intent to participate in the conspiracy." <u>United States v. Reyes</u>, 302 F.3d 48, 55 (2d Cir. 2002) (internal quotation marks omitted) (emphasis in original). The instruction is inappropriate "when the only evidence that alerts the defendant to the high probability of the criminal activity is direct evidence of the illegality such that the question for the jury is whether the defendant had either actual knowledge or no knowledge at all of the facts in question." <u>United States v. Cuti</u>, 720 F.3d 453, 463 (2d Cir. 2013) (internal quotation marks omitted).

6

Mirilashvili plainly put in issue his knowledge of the conspiracy. The opening statement by the defense argued that Mirilashvili was "a doctor who practiced old-world medicine but became the target of modern day criminals," Tr. 38, and that "the people in the office" knew about the criminal scheme and "undermined him," Tr. 49. On cross-examination of a cooperating witness, the defense adduced testimony that the witness never told Mirilashvili that medical documents, including MRIs, were fake. Tr. 542. And in closing, the defense argued that he "was not a detective," Tr. 1357, and that the government's cooperating witnesses "lied to the doctor about bribes, about fake paperwork, . . . [and] about overrides, the money they were putting in their own pockets." Tr. 1353.

There was also an appropriate factual predicate for the instruction: the government presented dozens of medical documents found in the clinic and Mirilashvili's home that had been altered, including multiple reports in which a patient's name was taped over a previous name and where a patient's name had been whited out and typed over in a different font, indicating forgery, and even a document where the patient name field was blank. See Tr. 1072-73. Altered documents put Mirilashvili on notice of a high probability that the individual presenting them was not a legitimate patient; and the doctor's "failure to question the suspicious circumstances establishes [Mirilashvili's] purposeful contrivance to avoid guilty knowledge." United States v. Kozeny, 667 F.3d 122, 134 (2d Cir. 2011) (internal quotation marks omitted).

The government properly argued that Mirilashvili either knew or deliberately avoided confirming that he was writing oxycodone prescriptions that were medically unnecessary. Miriliashvili's challenge to the conscious avoidance instruction is meritless.

**3.** Mirilashvili argues that the district court erred in calculating the forfeiture amount.

We review a district court's factual findings regarding forfeiture for clear error and its legal conclusions de novo. United States v. Sabhnani, 599 F.3d 215, 261 (2d Cir. 2010). A defendant convicted of a felony violation of Title 21 is

7

subject to the forfeiture of "any property constituting, or derived from, any proceeds . . . obtained, directly or indirectly, as the result of" the crimes of conviction. 21 U.S.C. § 853(a)(1). In imposing forfeiture, the district court has "considerable discretion in estimating the proceeds realized from drug trafficking." United States v. Roberts, 660 F.3d 149, 167 (2d Cir. 2011). "Because criminal forfeiture is viewed as part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence." United States v. Gaskin, 364 F.3d 438, 461 (2d Cir. 2004) (citations omitted).

Mirilashvili argues that the drug quantity found with respect to forfeiture was inconsistent with the drug quantity found with respect to the offense level for the purposes of the Guidelines calculation. During sentencing, the government asserted that Mirilashvili's criminal conduct included all the oxycodone prescriptions he had written in exchange for cash payments during the conspiracy, and that Mirilashvili was responsible for the unlawful distribution of 920,970 30-milligram oxycodone tablets. Mirilashvili countered that many of his patients suffered from real pain and received legitimate medical treatment; and that he was responsible for no more than the 29,493 tablets prescribed for his named co-defendants and the two cooperating witnesses. The district court agreed with the government, but observed that the higher drug quantity would result in a Guidelines range above the statutory maximum. Judge McMahon stated: "I'm not going to sentence Dr. Mirilashvili to 292 months, so let's just take this issue out of the case." App'x 448. Accordingly, Judge McMahon adopted (1) Mirilashvili's proposed drug quantity for calculating the sentence, yielding a Guidelines range of 151 to 188 months' imprisonment, and (2) the government's proposed drug quantity with respect to forfeiture, resulting in a forfeiture amount of $2,046,600.

The district court expressly found that there was "certainly enough evidence" to support the forfeiture amount sought by the government. App'x 460. This was not clearly erroneous. The government adduced evidence that Mirilashvili issued thousands of oxycodone prescriptions to cash-paying patients and that he was, at best, indifferent to whether they had any legitimate medical need. Over the course of the conspiracy, Mirilashvili wrote 14,621 oxycodone prescriptions, the overwhelming majority of which were for the same dosage of 90 30-milligram tablets. Mirilashvili's stash of over $1.75 million in Ziploc bags

at home indicates that he treated the cash proceeds of his clinic as the proceeds of unlawful activity.  Mirilashvili cites no case indicating that a forfeiture order is erroneous because it is inconsistent with a finding used to calculate the Guidelines range.

Mirilashvili also challenges the conclusion that *all* Mirilashvili's prescriptions in exchange for cash reflected unlawful drug sales.  Mirilashvili cites United States v. Archer, which held that the sentencing court could not extrapolate from four fraudulent visa applications that an additional 171 visa applications were also fraudulent.  671 F.3d 149, 163 (2d Cir. 2011).  Here, however, there was no unsupported extrapolation: the government's evidence established exactly how many oxycodone prescriptions Mirilashvili wrote in return for cash payments; that Mirilashvili disfavored patients who paid through insurance; that Mirilashvili's prescriptions were nearly all identical; and that Mirilashvili's entire practice was dedicated to the unlawful distribution of oxycodone.  Accordingly, the district court did not err in holding Mirilashvili responsible for all the prescriptions he wrote for cash-paying patients.

We have considered Mirilashvili's remaining arguments and conclude that they are without any merit.  The judgment of the district court is **AFFIRMED**.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

9