19-3596-cr(L)
*United States v. Muratov*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

      At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of March, two thousand twenty-one.

PRESENT:
> PIERRE N. LEVAL,
> GERARD E. LYNCH,
> JOSEPH F. BIANCO,
>     *Circuit Judges*.

---

United States of America,

     *Appellee*,

    v.                      19-3596-cr(L), 19-3816-cr(CON)

Sholom Muratov, Menachem Abramov

     *Defendants-Appellants*,

    v.

Godel Sezanayev, AKA Gary, Mark Mullakandov,
Albert Foozailov, Imanil Muratov, AKA Eddy,
Manashe Sezanayev, AKA Michael, Nathan Itzchaki,
Arkadiy Israilov, Ali Javidnezhad, Mark Natanzon,
Nizamuden Akbari,

     *Defendants*.[1]

---

[1] The Clerk of Court is respectfully directed to amend the caption as above.

FOR APPELLEE:

ANDREW THOMAS, Assistant United States Attorney (Thomas McKay, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY.


FOR DEFENDANT-APPELLANT
SHOLOM MURATOV:

GABRIEL ALTMAN, (Roger Lee Stavis and Adam K. Brody, *on the brief*), Mintz & Gold LLP, New York, NY.


FOR DEFENDANT-APPELLANT
MENACHEM ABRAMOV:

MATTHEW BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, NY.


Appeal from judgments of the United States District Court for the Southern District of New York (Schofield, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Sholom Muratov and Menachem Abramov appeal from judgments of conviction, entered on October 24, 2019 and November 7, 2019, respectively, following an eight-day jury trial in the United States District Court for the Southern District of New York. Muratov and Abramov were convicted of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349, arising from an alleged scheme to defraud merchants in Mumbai, India, out of millions of dollars in diamonds. Muratov and Abramov were each sentenced principally to thirty months' imprisonment and three years of supervised release. On appeal, appellants assert that they should receive a new trial on three grounds: (1) the district court improperly admitted evidence of certain jewelry show trips under Federal Rules of Evidence 404(b) and 403; (2) the district court erred by instructing the jury on conscious avoidance; and (3) there was a

2

constructive amendment to, or prejudicial variance from, the indictment because the government improperly presented to the jury a "right to control" theory of liability under the mail fraud statute. We assume the parties' familiarity with the underlying facts and procedural history of this case, to which we refer only as necessary to explain our decision to affirm.

## I.  Evidence of Jewelry Shows

Appellants argue that the district court erred by admitting testimony regarding the jewelry shows in Las Vegas and Miami because such evidence constituted "impermissible propensity evidence" under Rule 404(b).   Muratov's Br. at 10.   We disagree.

We review evidentiary decisions of the district court for abuse of discretion, which "stand[] unless [they were] arbitrary and irrational." *United States v. Williams*, 930 F.3d 44, 62 (2d Cir. 2019) (internal citations omitted).   "District courts have significant discretion in determining whether other-crimes evidence is admissible for a proper purpose." *Id.* at 63.   This recognizes the trial court's "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F3d. 220, 244 (2d Cir. 2012).

Under Rule 404(b), evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Fed. R. Evid. 404(b)(1).   However, "other-crimes evidence is admissible if offered for any purpose *other than* to show a defendant's criminal propensity," including motive, opportunity, knowledge, and intent. *Williams*, 930 F.3d at 62-63 (internal quotation marks omitted).   Moreover, evidence of uncharged criminal acts is not even considered "other crimes evidence" under Rule 404(b) if it "arose out of the same transaction or series of transactions as the

3

charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.").

Here, we conclude that the district court did not abuse its discretion in admitting the evidence regarding the jewelry shows under Rule 404(b), but rather properly admitted such evidence as background to, and direct evidence of, the charged conspiracy. With respect to the charged conspiracy, the government alleged that appellants and the other co-conspirators participated in a "bust out" scheme in which they obtained substantial quantities of diamonds from merchants in India on credit before intentionally withholding payment. According to the government's evidence, the scheme involved the creation of sham companies, falsified documents, and false promises of future payment, which ultimately resulted in numerous parcels of diamonds being shipped to the conspirators in New York, for which full payment was never remitted. The evidence at trial established more than $12 million in losses to the diamond-merchant victims from the alleged scheme.

Given this trial record, the district court properly concluded that the testimony regarding appellants' attendance at the jewelry shows with co-conspirator Mark Mullakandov, who testified as a government witness at trial, and other co-conspirators, was highly probative as direct evidence of the charged conspiracy, as well as background to that conspiracy. For example, the testimony regarding these shows linked appellants to their principal co-conspirator, Mullakandov, explained how they worked in coordination between their trips to Mumbai, and provided necessary context

4

for those trips. Moreover, the testimony regarding the shows helped to establish that appellants were using the same sham companies at the shows that they used to defraud the victim merchants in Mumbai. In addition, the trip to Las Vegas culminated in a meeting between appellants, Mullakandov, and the alleged mastermind of the scheme, Albert Foozailov, and a later conversation in the hotel where, according to Mullakandov, Muratov acknowledged that he "under[stood] what was going on" and then demanded more money from Mullakandov for their involvement in the scheme. App'x at 721. In short, it is clear from the record that the testimony regarding the jewelry shows in Miami and Las Vegas was inextricably intertwined with proof regarding the charged conspiracy and explained the nature of the relationship between appellants, the cooperating witness, and other co-conspirators.

To the extent appellants contend that they were prejudiced by the admission of testimony that Mullakandov purchased a bracelet with a check during the Miami trip, which Muratov later learned had failed to clear for insufficient funds, we find that argument unpersuasive. As a threshold matter, no objection was made at the time the testimony was offered, but rather was later raised in the context of objections to the Las Vegas trip. In any event, the testimony was not "other crimes" evidence, as there was no allegation that either Muratov or Abramov knowingly assisted Mullakandov in passing a bad check at the time of the purchase (and, in fact, there was no mention of Abramov at all); rather, this testimony was offered for the limited purpose of showing that Muratov was aware that Mullakandov lacked the funds to pay for the millions of dollars in diamonds that they were buying in India, given that he lacked funds to pay for even one bracelet. Evidence of the bounced check related only to Muratov's knowledge of Mullakandov's overall financial position, and did not imply a propensity to commit crimes as to either appellant, such that

5

any risk of prejudice was extremely minimal. In short, we find unpersuasive appellants' contention that the admission of this testimony, as well as the other challenged evidence related to the Miami and Las Vegas jewelry shows, was unfairly prejudicial under Federal Rule of Evidence 403. Moreover, although a limiting instruction is not required for direct evidence of the charged conspiracy that is outside the bounds of Rule 404(b), *United States v. Gaggi*, 811 F.2d 47, 60-61 (2d Cir. 1987), the district court further minimized any potential prejudice by providing a limiting instruction to the jury, which emphasized the testimony about the Las Vegas trip was offered only for background and should not be taken "to mean that Mr. Abramov or Mr. Muratov engaged in any wrongful act regarding the Las Vegas diamond merchants, nor that they had any propensity to commit such wrongful acts," App'x at 714. Accordingly, we conclude that the district court did not abuse its discretion in admitting the evidence of the jewelry shows in Miami and Las Vegas.

## II. The "Conscious Avoidance" Instruction

Appellants contend that the district court erred in instructing the jury on "conscious avoidance" because there was insufficient evidence at trial to warrant such an instruction. We review a claim of error in jury instructions *de novo*. *United States v. Binday*, 804 F.3d 558, 580-81 (2d Cir. 2015). Contrary to appellants' assertion, we conclude that a sufficient factual predicate existed for that instruction.

The court may instruct the jury on conscious avoidance "(i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists." *United States v. Nektalov*, 461 F.3d 309, 314 (2d Cir. 2006) (internal citations and quotation marks omitted). The second requirement is only met when "the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the

defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Aina-Marschall*, 336 F.3d 167, 170 (2d Cir. 2003) (internal quotation marks omitted).   Moreover, "[w]here the evidence could support both a finding of actual knowledge and a finding of conscious avoidance, the government may present conscious avoidance as an argument in the alternative." *Nektalov*, 461 F.3d at 316.   However, "a conscious avoidance instruction is not appropriate . . . when the evidence is that the defendant had either actual knowledge or no knowledge at all of the facts in question." *Id.* (internal quotation marks omitted).

Although appellants assert that the only evidence presented to the jury was of their *actual* knowledge of the conspiracy, we disagree.   To be sure, the government did present evidence of actual knowledge.   However, in response to appellants' argument that they lacked knowledge of the fraud, the government also offered extensive evidence that would allow a rational jury to find appellants were aware, at least, of the high probability that the Indian diamond merchants would not be paid, and consciously avoided confirming that fact.   *See United States v. Fofanah*, 765 F.3d 141, 144-45 (2d Cir. 2014).   The evidence of "red flags" that a jury could rationally find alerted appellants to the high probability of the fraudulent nature of the diamond transactions with the merchants in India included, *inter alia*, the following: (1) Abramov heard Mullakandov falsely deny knowing Foozailov; (2) Muratov and Abramov were told to conceal their relationship to Foozailov and to each other from the diamond merchants; (3) Muratov and Abramov observed Mullakandov distribute business cards and cellphones to representatives immediately prior to going to India; (4) Muratov learned, as noted *supra*, that Mullakandov lacked the funds to pay for a bracelet; (5) a local broker for the conspiracy showed false invoices to Muratov, Abramov, and

others; (6) Muratov and Abramov received phone calls demanding payment from the diamond merchants in India; and (7) Muratov was required to return merchant phone calls from a particular phone. Notwithstanding these red flags, appellants continued their participation in the conspiracy.

Appellants attempt to dismiss such warning signals as only bearing (at best) on their actual knowledge. However, we have emphasized that "[r]ed flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011). Therefore, this is not a case in which "there was only equivocal evidence that the defendant[s] had actual knowledge and . . . no evidence that the defendant[s] deliberately avoided learning the truth" about the fraudulent nature of the diamond transactions. *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000). Instead, there was more than sufficient evidence from which a rational jury could find that "[appellants'] involvement in the criminal offense [was] so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) (quoting *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003)). Accordingly, we conclude that there was a sufficient factual predicate for the conscious avoidance instruction, and that instruction provides no ground for a new trial.

### III. Constructive Amendment or Prejudicial Variance

Abramov and Muratov contend that, because the indictment did not contain charges regarding the "right to control" theory of liability for mail fraud, the government's presentation of that alternative theory at trial constituted a constructive amendment of the indictment or prejudicial

8

variance. A defendant raising a constructive amendment claim must establish that "the presentation of evidence and jury instructions . . . so modif[ied] *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013) (internal quotation marks omitted). In contrast to constructive amendment, a "variance" occurs "when the charging terms of an indictment are unaltered, but the trial evidence proves facts materially different from those alleged in the indictment." *United States v. Agrawal*, 726 F.3d 235, 260 (2d Cir. 2013). We review *de novo* challenges for constructive amendment or prejudicial variance. *See United States v. Dove*, 884 F.3d 138, 146, 149 (2d Cir. 2018). As set forth below, the trial record shows that the government pursued, and the district court correctly instructed on, a classic theory of mail fraud as charged in the indictment (and not a "right to control" theory), such that there was neither constructive amendment nor prejudicial variance.

Mail fraud under 18 U.S.C. § 1341 involves three essential elements: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). Although actual harm need not be proven, "the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." *Binday*, 804 F.3d at 569 (quoting *United States v. Novak*, 443 F.3d 150, 156 (2d Cir.2006)). Where "some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes . . . he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse." *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998). Under the classic mail fraud theory, the harm involved in the scheme is the deprivation of money or tangible property. *See* 18 U.S.C. § 1341. However, because "a defining feature of most

9

property is the right to control the asset in question," we also have recognized a "right to control" theory of mail fraud that allows a cognizable actual harm to be demonstrated "where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Binday*, 804 F.3d at 570 (alteration and internal quotation marks omitted). The "right to control" theory still requires "misrepresentations or non-disclosures [that] can or do result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).

Here, the core criminality alleged in the indictment was an agreement to defraud Indian diamond merchants through false promises to obtain property – namely, diamonds – on credit, with no intention to pay. This theory is succinctly stated in the indictment's "to wit" clause, which alleges that appellants and others "induced numerous victims in Mumbai, India . . . to send diamonds by interstate carrier by purporting to agree to payment terms that they did not, and had no intention to, honor." App'x at 101. Although appellants assert that the government switched to a "right to control" theory at trial whereby the conspirators sought to deceive the Indian diamond merchants as to the "essential terms of the bargain" by "depriv[ing] the victim[s] of potentially valuable economic information" to induce them into transactions, *see* Abramov's Br. at 24 (quoting *Binday*, 804 F.3d at 570), the trial record does not support that contention. Rather than asserting a "right to control" theory where the focus would be on depriving the merchants of valuable information regarding the diamond transaction (even if they had an ultimate intent to pay), the government repeatedly argued to the jury that appellants sought to deprive the merchants of the payment for the diamonds because they had no intention to pay and did intend to cause actual economic harm. For example, in its summation, the government explicitly argued that

10

"Muratov and Abramov ordered up millions of dollars in diamonds they never intended to pay for." App'x at 1254. This classic mail fraud theory was repeated multiple times in the summation, as the government argued that all appellants' misrepresentations were designed to obtain the diamonds on credit, and then keep them without paying. *See, e.g.*, App'x at 1270 (arguing that appellants "flat out said they would pay, and then they never did. And that was the plan."); App'x at 1259-60 (arguing that appellants' additional lies were part of a "step-by-step plan to take the diamonds," culminating in "disappear[ing] without paying"). At no point in the summation did the government articulate a "right to control" theory by describing the cognizable and intended harm as the loss of valuable economic information (as opposed to the millions of dollars in diamonds for which appellants and the other co-conspirators never paid), nor was a "right to control" instruction given to the jury.[2]

To the extent appellants assert that the "right to control" theory was triggered by the government's use of the phrase "they lied to get diamonds" in its summation because it presented a "conspiracy to exaggerate the Defendants' creditworthiness," Abramov's Br. at 28-29, we are unpersuaded. Contrary to appellants' contention, that phrase was consistent with the government's classic "bust out" mail fraud theme. In particular, it was used to rebut appellants' purported good faith claim by arguing that appellants intended to cause a financial or property loss to the merchants by keeping the diamonds without timely payment, even if they had some

---

[2] We note that there was a footnote in the government's October 21, 2018 letter to the district court regarding the proposed jury instructions in which it argued that the mail fraud statute's requirement of contemplated economic harm could be satisfied by "evidence that the defendants knew, or consciously avoided knowing, their conduct would result in a delayed payment, absence of payment, increased credit risk exposure, and encumbrance of the victims' goods for weeks or months." App'x at 871. That footnote, however, is irrelevant to the constructive amendment issue because no such language, or anything similar, was contained in the district court's jury instructions or in the government's summation.

11

purported belief (which the government also argued was fanciful) that eventually full payment for the diamonds would somehow be sent at some undefined point in the future.   *See* App'x at 1279-80 (emphasizing "if the defendant participated in a scheme for the purpose of causing some financial or property loss to another, then no amount of honest belief on the part of the defendant, [that] the scheme would not cause loss, will excuse fraudulent actions or false representations"); *see also* App'x at 1273-74 ("They had no sincere belief that there would be payment.   Everything about that transaction, everything that happened in that room, it was all a lie.").   Indeed, even in the context of the "they lied to get diamonds" statements made during summation, the government continued to emphasize that appellants knew there would be no payment.   *See, e.g.*, App'x at 1282 ("And these men knew.   They knew they were lying not just . . . about the companies they worked for, about how long these companies had been in business, how they related and ultimately, yes, *they lied about whether or not any payment would be made*.   They lied to get diamonds and they knew it." (emphasis added)).

In any event, even assuming *arguendo* that any of those "lied to get diamonds" references in isolation could be construed as also being consistent with a "right to control" theory, we fail to see any "substantial likelihood," *Vilar*, 729 F.3d at 81, or any likelihood at all, that such a veiled reference, with no jury instruction on such a theory, could have led the jury to detect that theory on its own, ignore the district court's actual instructions, and thereby convict appellants of an offense other than that charged in the indictment, *see United States v. Lebedev*, 932 F.3d 40, 54 (2d Cir. 2019) (concluding no constructive amendment occurred where "[t]he jury instructions described a conspiracy substantially the same as the one charged in the indictment").   Accordingly, we conclude that appellants have failed to show that the indictment was

constructively amended at trial.[3]

*             *             *

We have considered all of Muratov and Abramov's remaining arguments and find them to be without merit.    Accordingly, we **AFFIRM** the judgments of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe,
Clerk of Court

---

[3] For similar reasons, we also conclude that appellants' argument regarding prejudicial variance is unpersuasive.   The trial evidence did not "prove[] facts materially different from those alleged in the indictment," *Agrawal*, 726 F.3d at 260, and appellants were on notice, as early as from the filing of the criminal complaint, that the government's proof at trial regarding the mail fraud conspiracy would consist of a broad series of false statements, including statements about creditworthiness, *see* App'x at 72 ("In addition to the 'bust out,' the group deploys a variety of ruses, including bad checks, false references, forged documents, and simple lies to convince victims to part with diamonds without first demanding payment.").

13